UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CATHY A. MONAGHAN,

       Plaintiff,

    v.

EL DORADO COUNTY WATER AGENCY;
WILLIAM T. HETLAND; and DOES 1
through 50, inclusive,

       Defendants.

_____/

NO. 2:10-CV-0434 FCD GGH

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on defendant El Dorado
County Water Agency's (the "Agency" or "defendant") motion for
summary judgment or, in the alternative, summary adjudication.
Plaintiff Cathy A. Monaghan ("Monaghan" or "plaintiff") opposes

1

the motion.  For the reasons set forth below,[1] defendant's motion
is GRANTED in part and DENIED in part.

## BACKGROUND[2]

Plaintiff Monaghan began working for defendant Agency in May
2003, when she was hired as a full-time administrative assistant.
(UMF ¶ 5.)  In 2005, plaintiff was promoted to administrative
manager, working in human resources.[3]  (UMF ¶ 7.)  As part of
her duties, plaintiff was responsible for ensuring that the
workplace was free of harassment and discrimination.  (UMF ¶ 8.)
Plaintiff's immediate supervisor was defendant, William T.

_____

[1]     Because oral argument will not be of material
assistance, the court orders this matter submitted on the briefs.
E.D. Cal. L.R. 230(g).

[2]     The facts are, for the most part, undisputed.  Where
the facts are disputed, the court recounts plaintiff's version of
the facts as it must on a motion for summary judgment.  In that
regard, the court notes that, although not required by the
court's local rules, plaintiff did not file a separate statement
of "Disputed Facts," but rather only responded to defendant's
statement of undisputed facts, with citation to either
plaintiff's declaration or deposition testimony, both of which
plaintiff argues raise material disputed issues of fact
precluding summary judgment.  Thus, the court, in recounting the
relevant facts, refers to defendant's separate statement of
undisputed facts.  (See Def.'s Separate Stmt. Of Undisp. Material
Fact ["UMF"], filed Aug. 16, 2011, [Docket #19].) However, where
the facts are disputed, the court refers to plaintiff's response
to defendant's statement of undisputed facts.  (Pl.'s Response to
Def.'s Separate Stmt. of Undisp. Facts ["PRUF"], filed Sept. 02,
2011, [Docket #21].)

Moreover, the court, when necessary, cites to plaintiff
Monaghan's deposition testimony ("Monaghan Depo").  Counsel for
both parties lodged the relevant portions of the deposition
referred to by the court with their respective declarations.
(See Decl. of Franklin Gumpert ["Gumpert Decl."], filed Aug 16,
2011, [Docket #19, Exs A, B &C]; (Decl. Of Manolo Olaso, filed
Sept. 01, 2011, [Docket # 21, Exs. 1 & 2].)

[3]     Plaintiff disputes that she was the human resource
director over the agency; however, in her deposition, plaintiff
clearly states that she "was the HR person for the Water Agency."
(Monaghan Decl. at 84:6-6)

2

Hetland[4] ("Hetland"), the General Manager of the Agency. (UMF ¶ 6.)

After approximately one year of flirtation between plaintiff and Hetland, plaintiff, a trained massage therapist, gave Hetland a massage, at the end of which she kissed him on the forehead. (UMF ¶ 9.)  Plaintiff later gave Hetland another massage, which ended in the two engaging in a consensual sexual interlude. (UMF ¶ 10.)  Although both parties were married, Hetland and Plaintiff proceeded to carry on a consensual sexual relationship. (UMF ¶¶ 1, 11.)  According to plaintiff's deposition testimony, during this time Hetland "[a]bsolutely [did] not" condition her employment on having sex with him, nor did he threaten her in any other way if she refused to have sex with him.  (Monaghan Depo. at 193:9-21; 206:13-18.)  Indeed, according to plaintiff, the affair was completely mutual.  (Id. at 794:24; 153:10.)

Eventually, plaintiff decided to tell her husband about the affair.  (UMF ¶ 11.)  Afterward, plaintiff approached both her husband and Hetland with the proposition that the three of them engage in "three-way" sexual relations.  (UMF ¶ 14.)  Plaintiff, her husband, and Hetland, voluntarily engaged in a number of "three-way" sexual encounters.  (UMF ¶ 15.)  In October of 2007, plaintiff's husband asked her to end her relationship with Hetland.  (UMF ¶ 20.)  Although plaintiff did not want the relationship to end, she complied with her husband's wishes to end the affair.  (Monaghan Depo. at 194:8-14.)  When Plaintiff

---

[4]    Defendant Hetland filed a non-opposition to the Agency's motion for summary judgment.  (Def.'s Non-Opposition to Mot. for Summ. J., filed Sept. 02, 2011, [Docket #22].)

1  approached Hetland to end the relationship, he told plaintiff
2  that "he understood, and he was going to say this once and only
3  once, that he loved [her]." (Id. at 191:12-15.)

4        For a number of months after the affair ended, plaintiff and
5  Hetland did not engage in any sexual activity. (Id. at 194:15-
6  17.)  During this time, plaintiff and Hetland continued to send
7  each other humorous emails with sexual undertones; according to
8  plaintiff, this conduct was appropriate because they "were still
9  friends, [they] weren't in an argumentative, combative
10 relationship." (Id. at 200:2-14; 202:17-18.)  Plaintiff
11 testified that, after a couple of months, Hetland began
12 complaining to plaintiff about a lack of intimacy with his wife,
13 and told plaintiff that he missed their intimacy. (Id. at
14 194:15-20.)  According to plaintiff, this made her feel guilty,
15 and eventually, plaintiff and Hetland resumed a flirtatious
16 relationship. (Id. at 194:20-195:15.)  Plaintiff testified that
17 during this time, she "started drinking more, because [of] the
18 anxiety that [she] was getting [from] trying to please [her] boss
19 or a commitment or an obligation to him because he was unhappy."
20 (Id.)

21       On a weekend in 2008, plaintiff and Hetland resumed a
22 consensual sexual relationship at a Rancho Cordova hotel.
23 (UMF ¶ 22.)  According to plaintiff, she resumed the affair
24 because she felt that she "had some obligation to Bill Hetland to
25 fill in for the loss of intimacy he had with his wife."
26 (Monaghan Depo. at 203:16-19.)  Plaintiff testified that Bill
27 never indicated that her job would be in jeopardy if she did not
28 continue to have sex with him; instead, according to plaintiff,

                                4

she "felt that if emotionally [she] wasn't there for him that he could do away with [her]." (Id. at 206:13-20; 207:6-9.) Overall, Monaghan and Heltland had at least 12 more sexual encounters. (UMF ¶¶ 27-28.)

As stated above, during the course of the second affair, Monaghan began drinking heavily. In October of 2008, plaintiff voluntarily checked into an alcohol treatment program at Kaiser; however, in December of 2008, she began drinking again. (UMF ¶ 7.) Plaintiff admitted that, on several occasions, she was under the influence of alcohol at work. (Monaghan Depo. at 107:11-13.) On one occasion, plaintiff "had some drinks at lunch" and "hit a curb going out of the parking lot." (Id. at 107:20-19.) On June 8, 2009, plaintiff was arrested for driving under the influence of alcohol. (UMF ¶ 82.) Monaghan had to attend life skills courses as a provision of her punishment; she was permitted to leave work to attend those courses. (Monaghan Depo. at 103:22-104:10.) On August 24, 2009, plaintiff passed out at her desk after consuming too much alcohol. (UMF ¶ 85.) The situation culminated in August, 2009, when plaintiff was consuming alcohol from 7:00 a.m. until she fell asleep at night. (UMF ¶ 83.)

Plaintiff claims that she felt Hetland "was providing her alcohol and/or encouraging her to drink to keep her from reporting harassment." (PRUF ¶ 43.) However, plaintiff, in her deposition, stated that Hetland never forced her drink alcohol. (Monaghan Depo. at 216:3-13.) Plaintiff stated that Hetland was not having her drink so that he was sober and she was not;

1   instead, when they did drink alcohol together, she "could have

2   three glasses to his one," because of her alcoholic condition.

3   (<u>Id.</u> at 216:9-17.)

4       Plaintiff alleges that, In August of 2009, Hetland pressured

5   her "to have a sexual encounter with him at Lake Tahoe."

6   (Monaghan Decl. at 258:19-21.)  According to plaintiff's

7   deposition, Hetland wanted to "get together" with plaintiff after

8   a work meeting in Lake Tahoe.  (<u>Id.</u> at 261:22.)  When plaintiff

9   conveyed to Hetland that she preferred not to engage, "[h]e just

10  sighed."  (<u>Id.</u> at 261:25-262:6.)

11      In late August 2009, plaintiff and the Agency entered into a

12  written agreement (the "Agreement") that provided in part, "On

13  the basis of this conduct, Employer has decided to terminate

14  Employee's employment, but will suspend the termination of

15  employment on the following terms."  (Declaration of Catherine

16  Monghan (Monaghan Decl.), filed Sept. 02, 2011, [Docket #21 Ex.

17  1].)  Those terms required that plaintiff enter an alcohol

18  rehabilitation treatment program and notify the Agency within

19  three days of initial assessment, admission, or beginning

20  treatment.  (<u>Id.</u>)  The parties also agreed that, "during and

21  following any period of initial or continuing treatment, Employee

22  agrees that she will, as a condition of continued employment by

23  the Employer, comply with the treatment recommendations of her

24  treatment practitioners."  (<u>Id.</u>)

25      In a later agreement, dated August 27, 2009, plaintiff

26  agreed to participate in a 28-day residential rehabilitation

27  program offered by Duffy's Napa Valley from August 29, 2011, to

28

6

September 27, 2009. (Id. Ex. 2].) The agreement stated that the
Agency would like to meet with plaintiff on either September 28,
2009, or September 29, 2009, to receive her evaluation of the
program. (Id.) Plaintiff was permitted to take her accrued
leave credits during her stay at the facility. (Id.) Plaintiff,
however, had to pay for the agreement out-of-pocket. (Monaghan
Depo. at 122:20-123:17.) There is no dispute that plaintiff
finished the alcohol rehabilitation program in accordance with
the Agreement.

Pursuant to the second agreement, Monaghan met with the
Agency and Hetland, at which time Hetland presented plaintiff
with a termination letter, signed by Hetland, on behalf of the
agency. (Monaghan Decl. ¶ 22.) The letter stated the
plaintiff's "'at-will" employment with the El Dorado County Water
Agency is being terminated effective 5:00 p.m. on September 29,
2009." (Id., Ex. 2.) Plaintiff also signed an acknowledgment of
notice that her "'at-will' employment status . . . has changed by
reason of Involuntary Discharge." (Id. Ex. 3.)

Monaghan never told Hetland that he was sexually harassing
her. (UMF ¶ 34.) Before she was terminated from the Agency, she
never told anyone at the Agency about her affair and nobody knew
of her relationship with Hetland. (UMF ¶ 44.) Moreover,
plaintiff never told any member of the Agency board that she had
an affair with Hetland. (UMF ¶ 45.) Monaghan did, however, have
a discussion with the Agency's general counsel, Fred Schaefer, in
which she reported that Hetland yelled at her and was erratic;
however, she never reported to any person at the agency that she

was being *sexually* harassed.  (Monaghan Depo. at 227:6-24.)

On February 19, 2010, plaintiff filed a complaint in this court.  Plaintiff filed a first amended complaint on June 2, 2010.  In her first amended complaint, plaintiff alleges claims against Hetland and the Agency for (1) sex discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*; (2) sexual harassment in violation of California's Fair Employment and Housing Act ("FEHA"), California Gov't Code § 12900, *et seq.*; (3) failure to prevent sexual harassment in violation of FEHA; (4) retaliation in violation of Title VII; (5) retaliation in violation of FEHA; (6) breach of contract.[5]

**STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a

---

[5]    Plaintiff also filed a seventh claim for negligence. However, on July 20, 2010, the court dismissed plaintiff's claim for negligence with leave to amend.  (<u>See</u> Order, filed July 30, 2010, [Docket #12].)  Plaintiff failed to file and amended complaint to state a claim for negligence.

dispositive issue, a summary judgment motion may properly be made
in reliance solely on the 'pleadings, depositions, answers to
interrogatories, and admissions on file.'"   Id. at 324.   Indeed,
summary judgment should be entered against a party who fails to
make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial.   Id. at 322.   In such a
circumstance, summary judgment should be granted, "so long as
whatever is before the district court demonstrates that the
standard for entry of summary judgment, as set forth in Rule
56(c), is satisfied."   Id. at 323.

     If the moving party meets its initial responsibility, the
burden then shifts to the opposing party to establish that a
genuine issue as to any material fact actually does exist.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
253, 288-289 (1968).   In attempting to establish the existence of
this factual dispute, the opposing party may not rely upon the
denials of its pleadings, but is required to tender evidence of
specific facts in the form of affidavits, and/or admissible
discovery material, in support of its contention that the dispute
exists.   Fed. R. Civ. P. 56(e).   The opposing party must
demonstrate that the fact in contention is material, i.e., a fact
that might affect the outcome of the suit under the governing
law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986),
and that the dispute is genuine, i.e., the evidence is such that
a reasonable jury could return a verdict for the nonmoving party,

1  Id. at 251-52.

2      In the endeavor to establish the existence of a factual

3  dispute, the opposing party need not establish a material issue

4  of fact conclusively in its favor.  It is sufficient that "the

5  claimed factual dispute be shown to require a jury or judge to

6  resolve the parties' differing versions of the truth at trial."

7  First Nat'l Bank, 391 U.S. at 289.  Thus, the "purpose of summary

8  judgment is to 'pierce the pleadings and to assess the proof in

9  order to see whether there is a genuine need for trial.'"

10 Matsushita, 475 U.S. at 587 (quoting Rule 56(e) advisory

11 committee's note on 1963 amendments).

12     In resolving the summary judgment motion, the court examines

13 the pleadings, depositions, answers to interrogatories, and

14 admissions on file, together with the affidavits, if any.  Rule

15 56(c); SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir.

16 1982).  The evidence of the opposing party is to be believed, and

17 all reasonable inferences that may be drawn from the facts placed

18 before the court must be drawn in favor of the opposing party.

19 Anderson, 477 U.S. at 255.  Nevertheless, inferences are not

20 drawn out of the air, and it is the opposing party's obligation

21 to produce a factual predicate from which the inference may be

22 drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

23 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

24     Finally, to demonstrate a genuine issue, the opposing party

25 "must do more than simply show that there is some metaphysical

26 doubt as to the material facts. . . . Where the record taken as a

27 whole could not lead a rational trier of fact to find for the

28

10

nonmoving party, there is no 'genuine issue for trial.'"
<u>Matsushita</u>, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**ANALYSIS**

**1.   Plaintiff's Evidence**

In opposition to defendant's motion for summary judgment, plaintiff presents a declaration of plaintiff as rebuttal evidence.  Plaintiff's declaration poses numerous evidentiary problems.

Many of plaintiffs statements constitute unfounded, unsupported conclusions.  Conclusory statements without factual support are insufficient to defeat a motion for summary judgment. <u>National Steel Corp. v. Golden Eagles Ins. Corp.</u>, 121 F.3d 496, 502 (9th Cir. 1997).  Further,

> [a] plaintiff's belief that a defendant acted from an unlawful motive, without evidence to support that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive.  To be cognizable on summary judgment, evidence must be competent. . . . It is not enough for a witness to tell all she knows; she must know all she tells.

<u>Carmen v. San Francisco Unified School District</u>, 237 F.3d 1026, 1028 (9th Cir. 2001).  The type of conclusory allegations employed by plaintiff in her declaration merely frame the ultimate issues to be determined, but do not create a genuine issue of triable fact to defeat summary judgment.  <u>Radobenko v. Automated Equipment Corp.</u>, 520 F.2d 540, 543 (9th Cir. 1975).

Many of plaintiff's statements also contradict prior sworn testimony given though out her deposition.  "The general rule in the Ninth Circuit is that a party cannot create an issue of fact

11

by an affidavit contradicting prior deposition testimony."
Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266 (9th Cir.
1991).  This rule does not automatically dispose of every case in
which a contradictory affidavit is introduced to explain portions
of earlier deposition testimony, but is applied to disallow a
party to "create" an issue of fact by presenting "sham"
testimony.  Id. at 266-67.  "The district court must make a
factual determination that the contradiction was actually a
'sham.'"  Id. at 267.

     Defendant's objections to plaintiff's declaration are, in
the majority, sustained.  The court will address each evidentiary
issue that is material to plaintiff's claim and defendant's
motions in the context of its analysis.

**2.   Sexual Harassment under Title VII and FEHA**[6]

     Defendant moves to dismiss plaintiff's claims for sexual
harassment under both Title VII and FEHA because it contends that
the sexual relationship was consensual.  Moreover, defendant
maintains that plaintiff has not submitted sufficient evidence to
demonstrate that a reasonable person in her positions would
believe she would suffer adverse employment consequences if she
did not engage in a sexual relationship with Hetland, or if she
did not *continue* to engage in a sexual relationship with Hetland.

---

     [6]   Both FEHA and Title VII require that a party alleging
sexual harassment exhaust all administrative remedies with the
California Department of Fair Employment and Housing and the
Equal Employment Opportunity Commission before filing a complaint
a complaint.  In this case, there is no dispute as to whether
plaintiff exhausted her administrative remedies.  (See Pl.'s
First Amended Complaint, filed June 06, 2011, [Docket # 6], at ¶¶
12-21.)

1   Plaintiff contends that she *reluctantly* resumed a sexual
2   relationship with Hetland in 2008.  More specifically, plaintiff
3   asserts that she continued to engage in sexual activity with
4   Hetland because she felt an emotional obligation to him.  As
5   such, plaintiff maintains that Hetland insinuated that her
6   employment may be in jeopardy if she did not continue to engage
7   in their trysts.

8   Both Title VII and FEHA prohibit harassment based on sex.
9   42 U.S.C. 2000e; Cal. Gov't Code § 12940(j).  Under Title VII, a
10  claim for sexual harassment requires that plaintiff either be
11  subjected to "quid-pro-quo harassment," i.e. that a supervisor
12  conditioned employment benefits on sexual favors, or be subjected
13  to harassment in the form of a hostile work environment.  Craig
14  v. M & O Agencies, Inc., 496 F.3d 1047, 1054 (9th Cir. 2007).
15  "[A]lthough the wording of the Fair Employment Housing Act and
16  [T]itle VII of the Federal Civil Rights Act of 1964 . . . differs
17  in some particulars, the antidiscriminatory objectives and the
18  overriding public policy purposes are identical," and therefore,
19  California courts refer to applicable federal decisions where
20  appropriate.  Sorosky v. Burroughs Corp., 826 F.2d 794, 803 (9th
21  Cir. 1987) (citing County of Alameda v. Fair Employment & Hous.
22  Comm'n, 153 Cal. App. 3d 499, 504 (1984); Miller v. Dep't of
23  Corr., 36 Cal. 4th 446, 463 (2005); Guz v. Bechtel Nat'l, Inc.,
24  24 Cal. 4th 317, 354 (2000)).

25      A.   Quid Pro Quo Harassment

26  Plaintiff's claim for quid pro quo harassment rests on her
27  assertion that Hetland insinuated that her job may be affected if
28  she refused to continue to engage in sexual relations with him.

13

1  More specifically, plaintiff asserts that she suffered a tangible
2  employment action —— termination —— when she declined to "get
3  together" with Hetland after a work meeting in South Lake Tahoe
4  in July of 2009.

5      In order to withstand defendant's motion for summary
6  judgment on plaintiff's claim for quid pro quo harassment,
7  plaintiff must present sufficient evidence that: (1) she was
8  subject to unwelcome sexual advances by a supervisor; (2) the
9  harassment complained of was based on sex; (3) the employee's
10 reaction to the harassment complained of affected tangible
11 aspects of the employees occupation.  Holly D. v. California
12 Institute of Technology, 339 F.3d 1158, 1169-1171 (9th Cir.
13 2003).  The Ninth Circuit has "recognized that a supervisor's
14 demand for sexual favors accompanied by a threat of discharge
15 represents archetypical quid pro quo harassment." Id. at 1169.
16 It is not necessary that a supervisor explicitly demand sex in
17 exchange for job security; instead, a quid pro quo claim may lie
18 where plaintiff presents sufficient evidence that "the
19 supervisor's words or conduct would communicate to a reasonable
20 woman in the employee's position that such participation is a
21 condition of employment." Id, at 1173.  However, a "plaintiff
22 may not rest on unsubstantiated assertions which describe a
23 supervisor's behavior in a vague and general manner to show that
24 the request for sexual favors or the conditioning of benefits is
25 implicit.  Id. at 1176.

26     In this case, under the standard for summary judgment as the
27 Supreme Court set forth in Celotex, plaintiff has failed to
28 comply with her burden of presenting sufficient admissible

14

evidence that a reasonable woman in her circumstance would feel that her job was in danger if she did not continue to engage in a sexual liaison with Hetland.  Indeed, plaintiff's claim rests on unsubstantiated, vague and general allegations that she was terminated only because she refrained from engaging in one last rendevous with Hetland in July of 2009.[7]  However, plaintiff's own deposition testimony reveals that when she conveyed to Hetland that she preferred to not "get together" after the meeting in Lake Tahoe, Hetland replied only with a "sigh." (Monaghan Depo. at 261:25-262:6.)  Such a vague response does not "show that the request for sexual favors or the conditioning of benefits is implicit."  Holly D., 339 F.3d at 1176.

Perhaps even more persuasive than Hetland's response to plaintiff's denial of his request is that the evidence —— namely, plaintiff's own deposition testimony —— demonstrates that, when plaintiff ended the affair with Hetland the first time, in October of 2007, she did not suffer any "tangible employment action."  Holly D., 339 F.3d at 1169.  Indeed, when plaintiff told Hetland that she was ending the affair the first time, Hetland did not threaten plaintiff with any adverse employment

_____

[7]    Plaintiff's declaration contains other, similarly vague and unsubstantiated conclusion that Hetland implied that her job depended on her consenting to having sex with Hetland because he told her that "loyalty was important" and that Hetland had previously let two other employees go for being "disloyal." However, as discussed in Section 1 above, such conclusory statements contained in an affidavit without factual support, are not sufficient to defeat a motion for summary judgment.  National Steel Corp. v. Golden Eagles Ins. Corp., 121 F.3d 496, 502 (9th Cir. 1997).  Moreover, the statements contradict plaintiff's deposition testimony in which she repeatedly stated that Hetland never told her she would be let go if she did not continue to have sex with him.  See Kennedy v. Allied Mutual Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).

1  action; he merely agreed to end the relationship and told her

2  that he loved her. (Monaghan Depo. at 191:12-15.)  Thus, no

3  reasonable juror could find that a woman in plaintiff's position

4  would believe that declining to engage in this single sexual

5  encounter, after years engaging in  numerous affairs with

6  Hetland, would lead to termination on this occasion.

7       The fact that an employee had previously engaged in a

8  consensual sexual relationship with a supervisor is not an

9  affirmative defense to a claim of sexual harassment under either

10 Title VII or FEHA.  See Babcock v. Franks, 729 F.Supp.2d 279, 288

11 (S.D.N.Y. 1990).  However, this fact cannot be ignored.

12 Especially in a case arising under these circumstances; a case in

13 which plaintiff voluntarily engaged in a years long, on-again-

14 off-again, consensual relationship that never resulted in any

15 tangible employment action.  That is, not until plaintiff's own

16 misbehavior and abuse of alcohol led to her eventual dismissal.

17 When asked whether Hetland conditioned her employment on

18 continuing to engage in a sexual relationship with him, plaintiff

19 responded with an unequivocal "No."  (Monaghan Depo. at 205:10-

20 206:18.)  Instead, plaintiff contends that she continued to

21 engage in a sexual relationship with Hetland because she felt

22 "emotionally obligated."  (Id.)  Plaintiff's own emotional

23 proclivity to please her boss, however, without any concrete

24 reason to believe that her job would be affected, is not

25 sufficient to state a claim for quid pro quo harassment under

26 either FEHA or Title VII.

27      Thus, defendant's motion for summary judgment as to

28 plaintiff's quid pro quo sexual harassment claim under Title VII

1  and FEHA is GRANTED.

2      B.  <u>Hostile Work Environment</u>

3      Fefendant contends that plaintiff's claim hostile work

4  environment "sexual harassment fail[s] because she admits being a

5  voluntary participant in a longstanding sexual relationship with

6  [Hetland] away from work." (Def.'s Mem. in Support of Mot. for

7  Summ. J., filed Aug. 16, 2011, [Docket # 19], at 8:27-9:2.)

8  Plaintiff counters that she "reluctantly" continued the

9  relationship after the brief respite in the affair in the middle

10 of 2008.  More specifically, plaintiff contends that she only re-

11 engaged in the affair with Hetland because she felt pressured to

12 do so through Hetland's alleged emotional manipulation.

13     To establish a prima facie case for a violation of Title VII

14 and FEHA based on a hostile work environment, plaintiff must

15 demonstrate that the "workplace [was] permeated with

16 discriminatory intimidation . . . that [was] sufficiently severe

17 or pervasive to alter the conditions of [her] employment and

18 create an abusive working environment." <u>Harris v. Forklift Sys.,</u>

19 <u>Inc.</u>, 510 U.S. 17, 21 (1993) (internal quotations and citations

20 omitted); <u>Fisher v. San Pedro Peninsula Hosp.</u>, 214 Cal. App. 3d

21 590, 609 (1989).  Sexual harassment includes "unwelcome sexual

22 advances, requests for sexual favors, and other verbal or

23 physical conduct of a sexual nature that has the 'purpose or

24 effect of unreasonably interfering with an individual's work

25 performance or creating an intimidating, hostile, or offensive

26 working environment.'" <u>Miller</u>, 36 Cal. 4th at 463 (*quoting* 29

27 C.F.R. § 1604.11(a)(3)).  Moreover, "the fact that sex-related

28 conduct was 'voluntary,' in the sense that the complainant was

not forced to participate against her will, is not a defense to a sexual harassment suit." <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 68 (1986).  Rather, "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'"  <u>Id.</u> (citations omitted).  The determination of whether conduct was unwelcome "presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact."  <u>Id.</u>

Supervisors with the authority to control the environment may be held personally liable for harassment in violation of FEHA if they tacitly approved of the actions or if they were aware of the harassment and failed to take action to prevent it.  <u>Matthews v. Superior Court</u>, 34 Cal. App. 4th 598, 604 (1995).

> Unlike discrimination in hiring, the ultimate responsibility for which rests with the employer, sexual or other harassment perpetrated by a supervisor with the power to hire, fire and control the victimized employee's working conditions is a particularly personal form of the type of discrimination which the Legislature sought to proscribe when it enacted the FEHA. Our holding that the responsibility for such acts must be borne both by the offender as well as the employer who tolerates the offense is consistent with the Legislature's intent to provide effective remedies which will eliminate such discriminatory practices.

<u>Id.</u> at 605-06 (internal quotations omitted).  Accordingly, where the harassment is committed by a supervisor, the employer is strictly liable.  <u>State Dep't of Health Servs. v. Superior Court</u>, 31 Cal. 4th 1026, 1041 (2003).

Contrary to defendant's position, the voluntary nature of the relationship with Hetland is not sufficient reason to grant summary judgment on plaintiff's hostile work environment claim. The Supreme Court has specifically held that the mere fact that

18

sex-related conduct was 'voluntary,' in the sense that the
complainant was not forced to participate against her will, is
not a defense to a sexual harassment suit." <u>Meritor Sav. Bank,</u>
<u>FSB v. Vinson</u>, 477 U.S. 57, 68 (1986).  Thus, the court finds
defendant's voluntariness argument in the context of plaintiff's
hostile work environment claim unpersuasive, and does not grant
summary judgment on that basis.

In this case, the court cannot as a matter law, viewing the
evidence in a light most favorable to the plaintiff, conclude
that plaintiff was not subject to *unwelcome* sexual advances by
Hetland.  The evidence plaintiff submits creates a triable issue
of fact as to whether Hetland's conduct amounted to "unwelcome
sexual advances."  Plaintiff presented evidence that after she
ended the affair the first time, Hetland continued to make
comments about their relationship that could be inferred as
sexual advances.  Specifically: Hetland continually told
plaintiff that he did not get any intimacy at home; he told her
that he missed their relationship;[8] when Hetland was diagnosed
with cancer, he elected to not have surgery so that he could
continue to have sex with her.  (Monaghan Dep. at 194-195.)
According to plaintiff, this conduct made her feel guilty and
resulted in her re-engaging in the affair with Hetland out "of an
obligation to him because he was unhappy."  (<u>Id.</u>)

Whether this conduct amounts to a sexual advance and, more

_____

[8]     Based on plaintiff's deposition testimony, it is
inherently unclear whether Hetland's advances were unilateral or
whether the rekindling of the relationship was completely mutual.
Thus, there is a triable issue of fact as to whether Hetland's
conduct constituted unwelcome sexual advances under the Hostile
Work Environment rubric.

importantly, whether this conduct was unwelcome, constitutes a
triable issue of fact that cannot be determined by this court as
a matter of law.  In this case, whether this conduct was
unwelcome "presents difficult problems of proof and turns largely
on credibility determinations committed to the trier of fact."
<u>Meritor</u>, 477 U.S. at 68.  Thus, defendant's motion for summary
judgment as to plaintiff's claim for hostile work environment
sexual harassment under Title VII and FEHA is DENIED.

**2.   Failure to Prevent Sexual Harassment**

Defendant moves for summary judgment on plaintiff's claim
against the Agency for failure to prevent harassment in violation
of FEHA on the basis that plaintiff failed to complain of the
harassment until after she was terminated.[9]

It is an unlawful employment practice under FEHA "for an
employer . . . to fail to take all reasonable steps necessary to
prevent discrimination and harassment from occurring" in the
workplace.  Cal. Gov't Code § 12940(k).  When a plaintiff seeks
to recover damages based on a claim of failure to prevent
harassment, she must show three essential elements: (1) plaintiff
was subjected to discrimination, harassment or retaliation; (2)
defendant failed to take all reasonable steps to prevent
discrimination, harassment or retaliation; and (3) this failure
caused plaintiff to suffer injury, damage, loss or harm.  <u>Leland
v. City and County of San Francisco</u>, 576 F. Supp. 2d 1079, 1103

---

[9]    The Agency also contends that this claim fails for the
same reasons it argues that plaintiff's hostile environment
harassment claims fail.  However, for the reasons set forth
above, plaintiff has alleged sufficient facts to state a
harassment claim.  Accordingly, this argument is without merit.

1  (N.D. Cal. 2008) (citing California Civil Jury Instructions

2  (BAJI) 12.11).

3      In this case, plaintiff's claim fails as a matter of law

4  because the undisputed evidence demonstrates that not only did

5  plaintiff fail to complain to the agency about harassment on the

6  basis of sex, but *no other person at the agency knew about the*

7  *affair*.   Plaintiff alleges that she complained to the Agency's

8  counsel that Hetland was yelling and belittling her; however, she

9  admits that she never made any complaints regarding *sexual*

10 harassment.[10]   (UMF ¶ 50.)   Moreover, plaintiff does not dispute

11 that neither she nor Hetland ever told anyone at the agency,

12 including any member of the board of directors, that her and

13 Hetland engaged in a sexual relationship.   (UMF ¶¶ 44-46.)   Since

14 no person at the agency knew of plaintiff's relationship with

15 Hetland, and she never reported sexual harassment to any person

16 at the agency, plaintiff cannot establish that the Agency failed

17 to take reasonable steps to prevent sexual harassment under FEHA.

18 Thus, defendant's motion for summary judgment as to plaintiff's

19 claim for failure to prevent sexual harassment in GRANTED.

20 ///

21 ///

22

23      [10]   Plaintiff admits that she did not report any instances
24 of sexual harassment until after she was fired.   However, she
   claims that she was discouraged from reporting sexual harassment
25 because the Agency's counsel did not provide her sufficient
   support when she complained to him about Hetland's alleged
26 belittling.   This point, however, has no bearing on plaintiff's
   claim for failure to prevent *sexual* harassment because it does
27 not demonstrate that either the Agency, or any person at the
   Agency had any knowledge of either the alleged sexual harassment
28 or the fact that Hetland and plaintiff were engaged in a sexual
   relationship.

**3.   Retaliation**

The Agency also moves for summary judgment on plaintiff's claims for retaliation under Title VII and FEHA, arguing that (1) plaintiff did not engage in protected activity, and (2) she cannot demonstrate a causal connection between any protected activity and her termination because no Agency official was aware of the relationship between plaintiff and Hetland.  Plaintiff asserts that by rebuffing Hetland's overtures to engage in a sexual encounter at Lake Tahoe in August 2009, plaintiff opposed Hetland's allegedly unlawful discrimination prohibited under Title VII.

To state a prima facie retaliation claim under Title VII, a plaintiff must demonstrate "that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision."  Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1197 (9th Cir. 2003).  Conduct constituting a "protected activity" includes filing a charge or complaint, testifying about an employer's alleged unlawful practices, and "engaging in other activity intended to oppose an employer's discriminatory practices."  Id. (citing 42 U.S.C. § 2000e-3(a))(internal quotations omitted).  The elements of a cause of action for retaliation under FEHA are identical.  Tarin v. County of Los Angeles, 123 F.3d 1259, 1264 n.4 (9th Cir. 1997) superceded by statute on other grounds as recognized in Leisek v. Brightwood Corp., 278 F.3d 895, 899 n.2 (9th Cir. 2002); see also Flait v. North American Watch Corp., 3 Cal. App. 4th 467, 476 (1992).

Protected activities generally include either "opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII." Hunt v. Nebraska Public Power Dist., 282 F.3d 1021 (8th Cir. 2002). "A plaintiff ordinarily can establish protected opposition activity by evidence that he or she complained to the employer about discriminatory action taken against plaintiff." George Chamberlin, 4 Causes of Action 2d. 331 (2011). Examples of protected activity that fall within the ambit of the "oppositional clause" include: filing a criminal complaint against an administrator; informally voicing complaints to a superior; circulating a petition protesting employer's discrimination; writing a letter to employee's immediate supervisor; and participating in a boycott or protest against employer. 45 Am. Jur. 2d Job Discrimination § 224 (2011).

Causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987); Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000) ("That an employer's actions were caused by an employee's engagement in protected activities may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision.") (internal quotations omitted). An employer's awareness of the protected activity is required to supply evidence of a causal link between the protected activity and the adverse action. See Cohen v. Fred Meyer, Inc., 686 F.2d

23

793, 796 (9th Cir. 1982).

In this case, plaintiff's claim fails as a matter of law because she has failed to present any credible evidence that she engaged in a protected activity.  Plaintiff's contention that she opposed unlawful discrimination, and thus, engaged in a protected activity, merely by turning down Hetland's request to "get together" is without merit.  As set forth above, opposition to unlawful discrimination is not simply turning down a sexual advance;[11] rather, the essence of opposing unlawful discrimination lies where an employee reports improper work-place conduct to a superior or governmental entity.  Here, plaintiff never complained to anyone at the agency, including Hetland, about the alleged sexual harassment, nor to any person at the Equal Employment Opportunity Commission.  (UMF ¶¶ 44-46.) Indeed, nobody at the agency even knew of plaintiff and Hetland's sexual engagement.  (UMF ¶ 44.)

Cases of this nature necessarily turn on factual distinctions relating to management hierarchy.  For example, if Hetland was plaintiff's sole recourse to complain of Hetland's own allegedly improper behavior *and* Hetland was solely responsible for decisions regarding plaintiff's continued

---

[11]    As discussed in detail above, unwelcome sexual advances, such as Hetland's allegedly unwanted advances, fall under the rubric of hostile environment sexual harassment, not retaliation.  The purpose of a hostile work environment claim is to prevent a work-place in which employees are subject to inappropriate sexual remarks and/or advances.  The purpose of a retaliation claim, however, is to ensure that those who blow the whistle on inappropriate activity at the work place do not suffer adverse employment consequences for doing so.  Since plaintiff never "blew the whistle" on Hetland's allegedly improper conduct, the court finds that plaintiff did not engage in a protected activity.

employment, her claim based on retaliation would be clearly
viable.

That, however, is simply not the case here.  Not only did
plaintiff, *as a human resource employee*, know that she had
recourse to Hetland's superiors to seek redress outside of
Hetland —— namely, the board or the agency's counsel —— but, she
in fact complained to the agency's counsel reagrding Hetland's
alleged *non-sexual* misconduct; that complaint, however, made no
mention of *any* improper *sexual* misconduct.  Plaintiff also admits
that although she knew she could have filed a complaint with the
equal employment opportunity commission or the California
Department of Fair Employment and housing, she never did so.
(UF ¶ 48.)

Moreover, this is not a case in which an employee is
arbitrarily terminated without any rational justification.
Indeed, plaintiff admits that she engaged in serious work-place
misconduct.  Specifically, plaintiff continually abused alcohol
during work hours.  Plaintiff's alcohol abuse caused her to pass
out at her work desk as well as strike a curb with her vehicle
outside of the Agency facilities.[12]  Plaintiff admits that this
conduct may constitute proper cause for termination.  (UF ¶ 80.)
The court finds that the serious nature of plaintiff's work place
misconduct, combined with the fact that plaintiff, a human
resources employee, never once complained to anyone whatsoever

---

[12]   Plaintiff also admits that she had a subordinate
employee drive her during work hours to a casino where she ate
and gambled for two hours.  During this trip, she lied about
being at a Chamber of Commerce luncheon and ordered her
subordinate to lie about the luncheon as well.  (UF ¶ 77.)

about Hetland's allegedly improper sexual harassment, is fatal to plaintiff's claim for retaliation.

Since plaintiff, by her own admission, did not engage in any protected activity, her claim for retaliation fails as a matter of law.  Thus, defendant's motion for summary judgment as to plaintiff's claim for retaliation is GRANTED.

**4.   Breach of Contract**

Defendant also moves for summary judgment as to plaintiff's breach of contract[13] claim on the grounds that she was an at-will employee.[14]  Defendant's position rests entirely one sentence of the agreement: "Employee hereby acknowledges that she is an at-will employee and that she has engaged in disruptive and inappropriate conduct as an employee of [e]mployer." (Monaghan Decl., Ex. 1.)  Plaintiff contends that by complying with the agreement's condition precedent — paying for and completing alcohol rehabilitation — defendant was bound to abide by its promise to not terminate plaintiff.  Thus, plaintiff maintains, by terminating her days after she completed treatment, defendant

---

[13]   Neither party disputes that the agreement constitutes a valid, enforceable contract.  The disposition of the claim rests on the interpretation of the contract.  However, even if this were not a binding contract, the court notes that the doctrine of promissory estoppel may apply.  A claim for promissory estoppel will lie where a party reasonably relies on an express promise, and changes his or her position thereon.  In this case, the agreement required plaintiff to pay for the rehabilitation program out-of-pocket.  Thus, there is evidence supporting a claim that plaintiff relied on defendant's promise that they would not terminate her employment as long as she paid for and completed alcohol rehabilitation.

[14]   Defendant also contends that, even if plaintiff was not an at-will employee, there was cause for termination.  This argument is irrelevant, however, as the parties entered the agreement *after* the conduct that would have given rise to good cause for termination.

breached the agreement.

California Labor Code § 2922 provides that "employment having no specified term, may be terminated at the will of either party on notice to the other." While § 2922 controls where an employer and employee do not reach an alternative agreement, it does not prevent the parties from settling on different terms, such as "an agreement that the employee will be terminated only for 'good cause' in the sense of a fair and honest cause or reason, regulated by good faith, as opposed to one that is trivial, capricious, unrelated to business needs or goals, or pretextual." <u>Guz</u>, 24 Cal. 4th at 336 (internal quotations and citations omitted). The "parties may define for themselves what cause or causes will permit an employee's termination and may specify the procedures under which termination shall occur." <u>Id.</u>

"Contract interpretation begins with the language of the written agreement." <u>Coast Fed. Bank, FSB v. United States</u>, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing <u>Foley Co. v. United States</u>, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). Contract terms are to be given their ordinary meaning, and when the terms of the contract are clear, the intent of the parties must be ascertained from the contract itself. <u>Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.</u>, 896 F.2d 1542, 1549 (9th Cir. 1990). However, a court may consider extrinsic evidence to construe an ambiguous written contract. <u>Winet v. Price</u>, 4 Cal. App. 4th 1159, 1165 (1992). "'A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation.'" <u>Tanadgusix Corp. v. Huber</u>, 404 F.3d 1201, 1205 (9th Cir. 2005) (quoting <u>Kennewick Irrigation Dist. v. United</u>

27

States, 880 F.2d 1018, 1032 (9th Cir. 1989).

Based purely on the language of the agreement, the court cannot, as a matter of law, hold that plaintiff has no claim for breach of contract.  Defendant attempts to marshal the language of the agreement by singling one phrase stating that plaintiff is an "at-will employee."  An all-encompassing reading of the Agreement, however, paints a very different picture.

The Agreement provides, in relevant part, "Employer has decided to terminate Employee's employment, but will suspend the termination of employment on the following terms," specifying the requirement of alcohol rehabilitation treatment as a condition precedent to enforcement of the agreement.  (Monaghan Decl., Ex. 1.)  The portion of the agreement stating, "will suspend the termination of employment," is patently ambiguous —— it is not inconsistent with the alternative interpretations of either party.  Specifically, this clause can be interpreted as entitling plaintiff to continued employment, as long as she completes alcohol rehabilitation and refrains from future improper conduct.[15]  It can also be interpreted to hold plaintiff's termination in abeyance only for a period of time while she completed rehabilitation treatment.[16]  As such, at this stage of

_____

[15]    The agreement also stated that "during and following any period of initial and continuing treatment, Employee agrees that she will, as a condition of continued employment by Employer, comply with the treatment recommendations of her treatment practitioners."  (Monaghan Decl., Ex. 1.)  This provision comports with plaintiff's interpretation of the agreement.

[16]    The fact that the agreement acknowledges that plaintiff is an "at-will employee" comports with defendant's interpretation of the agreement.

the litigation, the court cannot conclude that the terms are clear on the face of the Agreement.

On a motion for summary judgment, where the court must view the allegations in the complaint in the light most favorable to the plaintiff, the court concludes that plaintiff has provided sufficient evidence to establish a plausible claim for breach of contract. Accordingly, defendant's motion to for summary judgment on this claim is DENIED.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part. Specifically:

1.    Defendant's motion for summary judgment on plaintiff's claim for quid pro quo sexual harassment in violation of FEHA and Title VII is GRANTED.

2.    Defendant's motion for summary judgment on plaintiff's claim for hostile work environment sexual harassment in violation of FEHA and Title VII is DENIED.

3.    Defendant's motion for summary judgment on plaintiff's claim for failure to prevent sexual harassment in violation of FEHA is GRANTED.

4.    Defendant's motion for summary judgment on plaintiff's claim for retaliation in violation of FEHA and Title VII is GRANTED.

5.    Defendant's motion for summary judgment on plaintiff's claim for breach of contract is DENIED.

IT IS SO ORDERED.

DATED: October 4, 2011

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE